**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No.:

AHMAD ELAKIL,

   *Plaintiff*,

v.

PUBLIC HEALTH TRUST OF MIAMI-DADE COUNTY, FLORIDA;
UNIVERSITY OF MIAMI; and RICARDO KOMOTAR, individually and
in his official capacity as Director of the Neuro-oncology Fellowship Program,

   *Defendants*.

_____/

**COMPLAINT AND JURY DEMAND**

COMES NOW, Plaintiff AHMAD ELAKIL ("Plaintiff" or "Dr. Elakil"), by and through his undersigned attorney, and hereby complains and alleges against the above-named Defendants, based upon knowledge, information and a reasonable belief derived therefrom, as follows:

**INTRODUCTION**

Dr. Elakil seeks damages and injunctive relief to remedy violations of his constitutional right to due process and for breach of contract by Defendants, PUBLIC HEALTH TRUST OF MIAMI-DADE COUNTY, FLORIDA (the "Trust"), UNIVERSITY OF MIAMI ("UM"), and RICARDO KOMOTAR. Dr. Elakil accepted a position in a neuro-oncology fellowship program (the "Fellowship") jointly operated by UM and the Trust. Dr. Elakil was subsequently promised a certificate of completion for the fellowship by his supervisor, Dr. Ricardo Komotar ("Dr. Komotar"), if he were to leave the fellowship early for employment. However, though Dr. Komotar had judged Dr. Elakil's performance to be excellent and identified no concerns with his qualifications, once Dr. Elakil resigned from his fellowship position to accept an offer of

1

employment, Dr. Komotar, UM and the Trust informed him that he would not be granted a certificate of completion. Dr. Elakil was not provided with an opportunity to appeal and could not rejoin the Fellowship.

As a result of the denial of the certificate of completion and Dr. Komotar's subsequent conversations with Dr. Elakil's prospective employer, Dr. Elakil's prospective employer withdrew his offer of employment. Without the certificate of completion, Dr. Elakil has been unable to pursue employment as a neurosurgical oncologist and has had his professional qualifications called into doubt. Accordingly, he now petitions this Court for redress in the form of injunctive relief, damages, costs and reasonable attorney's fees in relation to the violation of his rights, as well as damages for breach of contract and fraudulent inducement pursuant to Florida law.

## PARTIES

1.  Plaintiff, AHMAD ELAKIL, is a natural person, and citizen of the State of Louisiana, residing in Lafayette Parish, Louisiana. At all times relevant herein, Dr. Elakil was a fellow in the Neuro-oncology Fellowship program of the Jackson Health System.

2.  Defendant, PUBLIC HEALTH TRUST OF MIAMI-DADE COUNTY, FLORIDA, was created and established by "the authority of Chapter 73-102, Laws of Florida 1973, as an agency and instrumentality of Miami-Dade County." Miami-Dade County Code § 25A-1. The Trust operates Jackson Health System ("JHS"), which includes Jackson Memorial Hospital, and has its principal place of business in Miami, Florida.

3.  Defendant, UNIVERSITY OF MIAMI, is a non-profit educational institution located in Miami, Florida that operates graduate medical education and training programs. UM jointly operates multiple fellowship programs with the Trust, including the Neuro-oncology Fellowship Program through which fellows are placed at JHS for training.

4. Defendant, RICARDO KOMOTAR, is the Director of the Fellowship and an Associate Professor at UM. Dr. Komotar is sued in his personal and official capacity.

5. At all times relevant hereto, and in all the actions described herein, Defendants' actions took place in the State of Florida, County of Miami-Dade unless otherwise noted.

6. Defendants did the acts and omissions hereinafter alleged in bad faith and with knowledge that their conduct violated well established and settled law.

## JURISDICTION

7. This Court has jurisdiction over the claims set forth in this action pursuant to 28 U.S.C. § 1331 (federal question), as there exist claims based upon 42 U.S.C. §1983.

8. Supplemental jurisdiction over Plaintiff's pendant state law claims are proper pursuant to 28 U.S.C. § 1367(a), as there exist claims arising out of the same transaction and occurrence as his federal claims.

9. Venue in this jurisdiction is proper pursuant to 28 U.S.C. § 1391(b), as Defendants are located in this District or have significant contacts to this District, and all of the events giving rise to Plaintiff's claims occurred therein.

10. All conditions precedent to the maintenance of this suit and Plaintiff's claims have occurred, been performed or otherwise waived.

## GENERAL FACTUAL ALLEGATIONS

11. Dr. Elakil is a highly accomplished neurosurgeon who has completed a residency at the University of Calgary and earned a medical degree from King Saud University in Saudi Arabia, as well as a Master of Business Administration from Cornell University.

12. Dr. Elakil's peer-reviewed research has been published in numerous prestigious medical journals, and he has received a variety of awards and accolades in recognition of his accomplishments in the field of neurosurgery.

13. After completing his residency, Dr. Elakil decided to continue his medical training for the purpose of becoming a specialist in neurosurgical oncology.

14. In February 2018, after a two-year application process during which he considered several other promising fellowship opportunities, Dr. Elakil formally accepted a position in the Fellowship. The application process and initial acceptance were handled through UM's Miller School of Medicine.

15. The Trust, through JHS, jointly operates multiple fellowship and residency programs with the UM's Miller School of Medicine, which are accredited by the Accreditation Council for Graduate Medical Education or other national accrediting bodies for physician education and training.

16. During the Fellowship, fellows provide patient care at and are paid by JHS as part of the medical training programs provided by the Trust and UM.

17. JHS, UM and the residency and fellowship program directors are responsible for ensuring that residents and fellows receive the supervision, training and education necessary to meet national and medical board standards.

18. Following completion of a fellowship, fellows receive a completion certificate, signifying the institutions' determination that the physician successfully completed the fellowship.

19. Dr. Elakil entered the Fellowship on July 1, 2019, working in the Department of Neurosurgery in the area of Neuro-Oncology at Jackson Memorial Hospital in Miami, Florida.

20. At the time Dr. Elakil entered the Fellowship, the Fellowship informed him that it was accredited by the Society of Neurological Surgeon's Committee on Advanced Subspecialty Training ("CAST"). To be a CAST accredited fellowship, a fellowship program must provide a minimum number of specialty cases institution wide and for individual participants.

21. The Fellowship program is directed by Dr. Komotar, an Associate Professor at UM's Miller School of Medicine and a physician working at JHS. Dr. Komotar also serves as director for UM's Neurosurgery residency program.

22. In his capacity as Director of the Fellowship, Dr. Komotar was responsible for directly supervising Dr. Elakil's work at JHS and in the Fellowship, assessing his performance and determining whether he had demonstrated the requisite skill necessary to satisfactorily complete the Fellowship. As Director, Dr. Komotar also served as Dr. Elakil's contact for questions related to the Fellowship, including questions about administrative matters such as Fellowship completion.

23. Further, under JHS policy, as Dr. Elakil's direct supervisor, Dr. Komotar was Dr. Elakil's contact for all matters relating to resignation.

24. As a fellow, Dr. Elakil worked under a Collective Bargaining Agreement with the Committee of Interns and Residents ("CBA") that outlined the salaries, benefits and terms and conditions of the work of residents and fellows at JHS. The terms of the CBA provide that "the hospital shall issue the appropriate certificates upon the satisfactory completion of the training program and clearance by the Graduate Medical Education Office. Printed certificates will be furnished upon satisfactory completion of a program."

25. Dr. Elakil accepted a position in the Fellowship program based on an expectation that the Fellowship would permit him to gain significant additional surgical exposure, as required by CAST accreditation. Dr. Elakil initially intended to remain in the Fellowship for one year.

26. However, during the first months of the Fellowship, Dr. Elakil was not provided with the opportunities for surgical exposure to the extent promised. By contrast, Dr. Elakil observed that one of his colleagues, a co-fellow completing a combined residency and fellowship under Dr. Komotar's supervision, was frequently provided with surgical exposure.

27. Dr. Elakil repeatedly raised concerns with Dr. Komotar about this disparate treatment and requested modifications to his job duties, but Dr. Komotar replied that it would not be possible for Dr. Elakil to perform more surgeries during his fellowship and that such opportunities were reserved for medical residents.

28. Dr. Komotar made clear that this was not in any way due to Dr. Elakil's performance as a fellow, and, in fact, he frequently praised Dr. Elakil for his strong performance, making comments such as, "You are doing great" and "Your work is perfect."

29. In mid-October, after several months during which this disagreement over Dr. Elakil's job responsibilities was not resolved, Dr. Komotar suggested that Dr. Elakil instead begin searching for employment opportunities in the neurosurgical oncology field.

30. Dr. Elakil initially expressed concern that finishing the Fellowship early would prevent him from receiving a certificate of completion, as both he and Dr. Komotar were aware that a certificate is required in order to work as a specialist in the field of neurosurgical oncology.

31. Dr. Komotar clearly communicated that Dr. Elakil would still receive a certificate of completion if he finished the Fellowship early and confirmed that he believed Dr. Elakil was fully qualified to begin working as a neurosurgical oncologist based on his performance in the

Fellowship. He therefore advised Dr. Elakil that if he could find a job, he should leave the Fellowship early.

32. With Dr. Komotar's assistance, Dr. Elakil began applying to neurosurgical oncology positions, keeping Dr. Komotar apprised of his progress. Dr. Komotar even provided prospective employers with favorable reference letters recommending Dr. Elakil as a strong candidate for a neurosurgical oncology position.

33. On October 16, 2019, Dr. Elakil reached out to Dr. Komotar noting that a prospective employer was very interested and needed a letter of recommendation. Dr. Komotar responded immediately that he had provided one. In response to Dr. Elakil's thanks, Dr. Komotar replied that same day, "We need to finalize your job situation soon!".

34. Dr. Elakil then followed up on Dr. Komotar's prior promise of a certificate, asking if the certificate would be a CAST approved certificate of completion and whether such certificate required a certain minimum number of months in the Fellowship.

35. In an email to Dr. Elakil sent on October 17, 2019, at 10:31 a.m., in response to Dr. Elakil's inquiry, Dr. Komotar wrote "You will get the certificate at the end, even if you leave early… So let[']s get you a job soon!"

36. Dr. Elakil responded that, "If it's for sure I get the fellowship certificate, CAST approved, at the end then I can basically end whenever you like. What do you think works for you the best? You are most important to me and I really appreciate everything you have done for me."

37. In a subsequent email, Dr. Komotar stated he had checked with officials at Jackson Health Services to verify that receiving the certificate would not be a problem.

38. Following these emails, and while searching for a job, Dr. Elakil had multiple conversations with Dr. Komotar in person wherein Dr. Komotar again reassured Dr. Elakil that the certificate would be issued.

39. Throughout, Dr. Komotar encouraged Dr. Elakil to seek employment immediately, prior to the end of the Fellowship, even emailing Dr. Elakil notices of potential job opportunities.

40. Dr. Elakil was ultimately offered a neurosurgical oncology position in Cleveland, Florida and he informed Dr. Komotar of this offer and his intention to take it based on Dr. Komotar's prior statement.

41. Dr. Elakil and Dr. Komotar emailed regarding Dr. Elakil's resignation date, and Dr. Komotar directed him to proceed with resigning as of November 1, 2019 and directed Dr. Elakil to the necessary forms.

42. Relying on Dr. Komotar's repeated assurances that he would receive his completion certificate and his agreement regarding Dr. Elakil's early departure, Dr. Elakil resigned from the Fellowship effective November 1, 2019 to begin his new position.

43. After resigning from the Fellowship, officials at the UM Graduate Medical Education Office informed Dr. Elakil that he would not receive a certificate of completion because he resigned before the end of the requisite 12-month fellowship period.

44. Soon thereafter, he learned that his prospective employer no longer planned to move forward with his offer of employment and that, following their call with Dr. Komotar, they were under the misapprehension that Dr. Elakil's fellowship had ended early due to wrongdoing or poor performance on the part of Dr. Elakil. Dr. Elakil later learned that Dr. Komotar had told Dr. Elakil's residency program and was telling prospective employers that Dr. Elakil had been fired for deficiencies in his performance and errors during surgery.

45. Dr. Elakil promptly emailed and sent text messages to Dr. Komotar to clear up the confusion regarding the agreed-upon issuance of his certificate.

46. In a text exchange on November 4, 2019, Dr. Komotar's story began to change. Whereas previously Dr. Komotar had expressed only complete confidence about the certificate's issuance, he now claimed he had learned of a potential issue with the fellowship program's accreditation by CAST that would likely mean both Dr. Elakil and his co-fellow would not receive CAST certificates of completion.

47. However, the lack of CAST certificate would not prevent either UM or the Trust from issuing its own certificate of completion for the Fellowship, which, though not as advantageous as a CAST certificate, would have been sufficient. The issuance of an institutional certificate of completion required the agreement of both UM and JHS.

48. Dr. Elakil reminded Dr. Komotar that he had resigned from the program solely based on and in reliance on their agreement that he would be issued the certificate, and further stated he hoped this issue could be resolved but that he was prepared to seek legal representation if the agreed-upon contractual obligation was not fulfilled. Dr. Komotar replied, "Don't get lawyers. Let me see."

49. On November 6, 2019, at 10:52 a.m., Dr. Elakil received an email from Dr. Komotar informing him that Dr. Komotar had checked with the Trust and governing educational body and they had denied his certificate: "Reached out to Jackson, the governing educational body, and they are unable to give you a certificate." No further explanation was provided and institution policies at the Trust and UM did not provide any mechanism for appeal of administrative review of the decision to deny the certificate.

50. Dr. Elakil continued to reach out to Dr. Komotar and other officials at JHS and UM repeatedly, but he received no further assistance from his advisor and was again informed that it would not be possible for him to receive the certificate, even from UM or the Trust.

51. Nor would UM or JHS permit him to return to the Fellowship to complete it now that he had been informed that early departure would not in fact be permissible.

52. Dr. Elakil attempted to grieve and appeal the failure to issue the certificate of completion under the terms of the CBA but received no response and thus was denied the opportunity to do so.

53. Dr. Elakil has been unemployed since resigning from the Fellowship. He has applied to neurosurgical oncology positions with employers who were impressed by his qualifications and expressed interest in hiring him, but he has not been able to work as a neurosurgical oncologist because he lacks the certificate verifying his completion of a fellowship in this specialty.

54. Not only has Dr. Elakil been deprived of the fellowship income and benefits he would otherwise be receiving during this time if he had not been induced to resign, but he also has lost the opportunity for the compensation he would be earning as a neurosurgical oncologist, at a daily rate of approximately $3,000 to $5,000.

55. Additionally, in reliance on Dr. Komotar's assurances that he would receive a certificate that would enable him to begin a new position, Dr. Elakil terminated the lease on his apartment and has now been forced to live in a hotel at great expense.

56. Dr. Komotar's behavior has also damaged Dr. Elakil's professional reputation, raising unfounded doubts among prospective employers and medical colleagues with respect to

Dr. Elakil's credibility and job performance and further damaging his ability to obtain future employment.

57. As a result of the cumulative actions by the Defendants, Dr. Elakil has suffered tremendously, physically, mentally, emotionally, and financially, and he has lost out not only on the salary he would have earned as a neurosurgical oncologist, but also opportunities for professional advancement now and in the future.

## **FIRST CAUSE OF ACTION**

### *CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983 (DENIAL OF PROCEDURAL DUE PROCESS)*

### **Against All Defendants**

58. Each of the allegations set forth in paragraphs 1 through 57, inclusive, are hereby incorporated by this reference as if realleged fully herein.

59. All persons residing in the United States are afforded the right to procedural due process through the Fourteenth Amendment of the United States Constitution.

60. Dr. Elakil had a contractual right to receive a certificate of completion based on the CBA and Dr. Komotar's promises.

61. Dr. Elakil therefore had a constitutionally protected property interest in the receipt of certification of completion.

62. Further, Dr. Elakil had a constitutional protected liberty interest in his reputation and ability to pursue future employment without the stigma imposed by an apparently unfinished fellowship and Dr. Komotar's smearing of his reputation.

63. Defendants did not provide notice of their intent to deny the certificate of completion prior to the denial, nor any opportunity for Dr. Elakil to respond to the denial either before or after the decision was made.

11

64. Defendants denied Dr. Elakil his certificate of completion without providing the process that he was due, in violation of the Fourteenth Amendment.

65. In operating the Fellowship and providing training for fellows jointly with the Trust, UM and the Trust were engaged in a joint enterprise so as to render UM a state actor.

66. Defendants acted under color of state law in violating the Fourteenth Amendment, as described herein in violation of 42 U.S.C. § 1983.

67. As a result of Defendants' official policies, acts, omissions, and practices, Dr. Elakil has suffered irreparable harm because he was deprived of his right to procedural due process.

68. Defendants' actions and omissions proximately caused Dr. Elakil to suffer, and he continues to suffer damages academically, financially and emotionally, including humiliation, severe emotional distress, loss of professional reputation, and permanent professional damage.

69. The acts, conduct, and behavior of Defendants have denied Dr. Elakil his procedural due process rights, by reason of which Dr. Elakil is entitled to damages and injunctive relief of immediate issuance of his certificate of completion.

70. The acts, conduct and behavior of Dr. Komotar in acting to deny Dr. Elakil his procedural due process rights were performed knowingly, intentionally, oppressively, and maliciously, by reason of which Dr. Elakil is entitled to compensatory and punitive damages against him in his individual capacity in a sum in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

71. It has been necessary for Dr. Elakil to obtain the services of an attorney to prosecute this action, and he is entitled to an award of attorney's fees and costs of suit incurred herein.

## SECOND CAUSE OF ACTION

### *CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983 (DENIAL OF SUBSTANTIVE DUE PROCESS)*

### Against All Defendants

72. Each of the allegations set forth in paragraphs 1 through 71, inclusive, are hereby incorporated by this reference as if realleged fully herein

73. All persons residing in the United States are afforded the right to substantive due process through the Fourteenth Amendment of the United States Constitution.

74. The protections of the Substantive Due Process clause of the Fourteenth Amendment bar the government from taking arbitrary action that results in the deprivation of a person's interest without reasonable justification.

75. Dr. Elakil had a constitutionally protected property interest in his receipt of the certificate of completion or the opportunity to complete the Fellowship.

76. As part of the system of graduate medical education, the Fellowship was a post-secondary educational program jointly operated by UM and the Trust.

77. Dr. Elakil is afforded rights under the Fourteenth Amendment's substantive due process clause that enables this Court to override a post-secondary public educational program's decision where the program's actions were arbitrary and capricious.

78. Defendants expressed no academic or professional concerns with Dr. Elakil's performance and in fact Dr. Komotar communicated his belief that Dr. Elakil had performed more than satisfactorily and demonstrated the skills necessary to fulfill the goals of the Fellowship and receive a certificate of completion.

79. Dr. Komotar in fact promised Dr. Elakil that he would receive such certificate even if he left early, and actively encouraged him to and assisted him in locating and leaving for

employment as soon as possible, and stating that JHS had confirmed that the certificate would be provided.

80. It was only after Dr. Elakil had resigned in reliance on these promises in order to take a position that Defendants knew depended on his receipt of the certificate of completion that Dr. Komotar informed him that he would not in fact receive such a certificate from either UM or the Trust.

81. Further, Dr. Komotar then spoke with Dr. Elakil's prospective employer, leaving them with the impression that Dr. Elakil had had to leave the program due to professional or other deficiencies, resulting in the prospective employer's withdrawal of it's offer of employment, and further contacted Dr. Elakil's residency program and spoke negatively about him.

82. The misleading promise to issue and subsequent denial of the certificate and the intentional tarnishing of Dr. Elakil's reputation was arbitrary, capricious and without rational basis.

83. In operating the Fellowship and providing training for fellows jointly with the Trust, UM and the Trust were engaged in a joint enterprise so as to render UM a state actor.

84. Defendants acted under color of state law in violating the Fourteenth Amendment, as described herein in violation of 42 U.S.C. § 1983.

85. As a result of Defendants' official policies, acts, omissions, and practices, Dr. Elakil has suffered irreparable harm because he was deprived of his rights to be free from arbitrary, capricious abuse perpetrated by state actors acting on behalf of the state.

86. Defendants' false and misleading statements and actions cost Dr. Elakil the ability to continue in the Fellowship and the opportunity to obtain employment in his chosen specialty, as the certificate of completion is necessary for such employment, and have cast doubt on Dr.

Elakil's to all future employers and potential Fellowship programs by virtue of the unfinished fellowship

87. Defendants' actions and omissions proximately caused Dr. Elakil to suffer, and he continues to suffer damages academically, financially and emotionally, including humiliation, severe emotional distress, loss of professional reputation, and permanent professional damage.

88. The acts, conduct, and behavior of Defendants have denied Dr. Elakil his procedural due process rights, by reason of which Dr. Elakil is entitled to injunctive relief of immediate issuance of his certificate of completion.

89. The acts, conduct and behavior of Dr. Komotar in acting to deny Dr. Elakil his procedural due process rights were performed knowingly, intentionally, oppressively, and maliciously, by reason of which Dr. Elakil is entitled to compensatory and punitive damages against him in his individual capacity in a sum in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

90. It has been necessary for Dr. Elakil to obtain the services of an attorney to prosecute this action, and he is entitled to an award of attorney's fees and costs of suit incurred herein.

## THIRD CAUSE OF ACTION

### *BREACH OF CONTRACT*

**Against the Public Health Trust of Miami-Dade County, Florida and University of Miami**

91. Each of the allegations set forth in paragraphs 1 through 90, inclusive, are hereby incorporated by this reference as if realleged fully herein.

92. Dr. Elakil had a contract with UM in connection with rights explicitly guaranteed by the policies for Graduate Medical Education and the terms of jointly operated Fellowship

Program, including the right to receive a certificate of completion upon satisfactory completion of the Fellowship.

93. Dr. Elakil had a contract with the Trust in connection with rights explicitly guaranteed by the CBA, the policies for Graduate Medical Education and the terms of the Fellowship Program, including the right to receive a certificate of completion upon satisfactory completion of the Fellowship

94. Dr. Komotar was employed by UM and working as Dr. Elakil's direct supervisor at JHS, and was by policy Dr. Elakil's contact for employment related matters including resignations and completion of the Fellowship on behalf of both the Trust and UM.

95. Dr. Komotar was therefore an actual or apparent agent of the Trust and UM authorized to speak on their behalf when promising that Dr. Elakil would receive his certificate of completion.

96. Dr. Komotar repeatedly promised in emails to grant Dr. Elakil his certificate of completion if Dr. Elakil secured employment and left the Fellowship early.

97. Article 11, section 3, of the CBA mandates that JHS "shall issue the appropriate certificates upon the satisfactory completion of the training program and clearance by the Graduate Medical Education Office. Printed certificates will be furnished upon satisfactory completion of a program."

98. The terms of the CBA and Dr. Komotar's emails, separately and together, are sufficient to form a contract between the Trust, UM and Dr. Elakil for the issuance of a certificate of completion upon his resignation.

99. Defendants' actions in breaching the contract were arbitrary, capricious and in bad faith.

100. As a direct and proximate result of Defendants' unlawful breaches, Dr. Elakil has suffered and continues to suffer irreparable harm, injury, and damages; including, but not limited to, monetary damages, time and resources, career opportunities and earning capacity, mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment, and loss of personal and professional reputation, all in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

101. It has been necessary for Dr. Elakil to obtain the services of an attorney to prosecute this action, and Dr. Elakil is entitled to an award of attorney's fees and costs of suit incurred herein.

102. Dr. Elakil is further entitled to obtain his certificate of completion from Defendants.

## FOURTH CAUSE OF ACTION

### *FRAUDULENT INDUCEMENT*

### Against Defendant University of Miami

103. Each of the allegations set forth in paragraphs 1 through 102, inclusive, are hereby incorporated by this reference as if realleged fully herein.

104. Courts in Florida recognize the tort of fraudulent inducement.

105. Dr. Komotar's statement that Dr. Elakil would receive a certificate of completion was a false statement of material fact.

106. In making these statements, Dr. Komotar was acting with actual or apparent authority as an agent of the Trust and UM.

107. Dr. Komotar, as Director of the Fellowship, knew or should have known that this statement was false.

108. Dr. Komotar intended his statement that Dr. Elakil would receive a certificate of completion to encourage and induce Dr. Elakil to resign early to accept employment.

109. Dr. Elakil reasonably and justifiably relied on Dr. Komotar's statement in resigning from the Fellowship, to his detriment.

110. As a direct and proximate result, Dr. Elakil has suffered and continues to suffer irreparable harm, injury, and damages; including, but not limited to, monetary damages, time and resources, career opportunities and earning capacity, mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment, and loss of personal and professional reputation, all in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

111. It has been necessary for Dr. Elakil to obtain the services of an attorney to prosecute this action, and Dr. Elakil is entitled to an award of attorney's fees and costs of suit incurred herein.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which he has a right to jury trial.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for relief as follows:

1. For general and compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) to be determined at trial;

2. For punitive damages against the Individual Defendants in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) to be determined at trial;

3. For injunctive and declaratory relief described herein, as the Court deems appropriate;

4. For pre-judgment and post-judgment interest, as provided by law;

5. For the costs and disbursements of this action, including experts, and such other attorneys' fees, pursuant to 42 U.S.C. § 1988; and

6. Such other and further legal and equitable relief as this Court deems necessary, just and proper.

Dated this 28th day of February, 2020.

Respectfully submitted,

   /s/ Christopher J. Brochu
Christopher J. Brochu, Esq.
Florida Bar ID # 1013897
Law Office of Christopher J. Brochu, PLLC
One Call Tower
841 Prudential Dr., Suite 1200
Jacksonville, FL 32207
Telephone: (904) 201-1771
c.brochu@brochulaw.com

**THE BACH LAW FIRM, LLC**
JASON J. BACH, ESQ.
(*Pro Hac Vice Pending*)
Nevada Bar No. 7984
7881 W. Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
jbach@bachlawfirm.com

*Attorneys for Plaintiff Ahmad Elakil*